Filed 4/16/15  In re Reece W. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re REECE W.,<br><br>a Person Coming Under the Juvenile Court Law. | B255872<br>(Los Angeles County<br> Super. Ct. No. DK02562) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>THOMAS W.,<br><br>    Defendant and Appellant. | |

        APPEAL from an order of the Superior Court of Los Angeles County, Julie F. Blackshaw, Judge.  Affirmed.

        John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

        Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Kim Nemoy, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

Father, Thomas W., appeals from dependency court orders sustaining jurisdictional allegations that his son, Reece W., is a person described by Welfare and Institutions Code section 300 (section 300) and removing him from Father's custody. Father contends there is no substantial evidence that Reece suffered or is at substantial risk of suffering serious physical harm such that he falls within section 300, subdivision (b). We disagree and affirm the jurisdictional and dispositional orders.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Procedural Background*

The Department of Children and Family Services (DCFS) filed a dependency petition alleging two counts as to Father under section 300, subdivision (b). First, the petition alleged that Father "has mental and emotional problems including a suicide attempt in 2009, which renders the father unable to provide regular care and supervision of the child. On 11/29/2013, the father was involuntarily hospitalized for the evaluation and treatment of the father's psychiatric condition. The mother knew of the father's mental and emotional problems and failed to protect the child, in that the father had unlimited access to the child. Such mental and emotional problems on the part of the father endangers the child's physical health and safety and places the child at risk of physical harm, damage, danger and failure to protect." Second, it was alleged that Father "placed the child in a detrimental and endangering home environment in that 3 shot guns, one fully loaded, 4 rifles, scopes, gunpowder, a laser sight, a bullet machine, gun simulators and 1000 rounds of ammunition were found in the child's home, within access of the child. The father has criminal convictions of Disorderly Conduct –

2

Prostitution, Obstruct/Resist Police Officer, Assault on Custodial Officer, Assault With a Deadly Weapon, Battery, Driving While Under the Influence, Violating a Restraining Order and False Identification to a Peace Officer. The mother knew of the endangering situation and failed to protect the child, in that the mother purchased the guns, knowing that father is on probation and not able to have own [*sic*] or have access to weapons. Such a detrimental and endangering home environment established for the child by the father, and the mother's failure to protect, endangers the child's physical health and safety, creates a detrimental home environment, and places the children at risk of physical harm, damage, danger and failure to protect."

At the detention hearing, Reece was ordered detained from Father and was placed with Mother, Elaine W., who is married to Father. The court ordered monitored visitation for Father, who had moved out of the family home.

At the contested adjudication hearing, the court admitted into evidence the following: (1) a December 4, 2013 detention report, subject to some sustained objections to hearsay in that report; (2) a February 6, 2014 jurisdiction/disposition report, subject to some sustained hearsay objections; (3) a last minute report dated February 6, 2014; and (4) a last minute report dated April 21, 2014. In addition, Father called two of the family's neighbors to testify at the hearing.

The court found true both counts in the dependency petition. The court thus found that Reece was a person described by section 300, subdivision (b) and declared him a dependent child. The court also removed Reece from Father's custody and ordered monitored visitation.

Father timely appealed.

B. *Evidence at the Jurisdictional and Disposition Hearing*

1. *First Referral*

Reece first came to the attention of DCFS in January 2013, when DCFS received a referral indicating that Father had gotten into two arguments in public in front of Reece and had been removed from a ballpark. At that time, Reece denied being fearful of either parent, but stated that his parents frequently yelled at each other and sometimes Mother would come into Reece's room crying to get away from the arguing. Mother denied there were any firearms in the home. The caseworker was never given access to the home, and Father refused to cooperate. When approached outside his home by the caseworker, Father twice told her to "get the f--- out of here and to f--- off" and then got into his car and drove off. He was reported to be odd and abrasive and to have ongoing problems with his neighbors. However, the dependency allegations were deemed unfounded.[1]

2. *Second Referral*

a. *Father's Discharge of Firearm*

DCFS received a second referral regarding Reece after law enforcement responded to his family's home on November 27, 2013, when multiple neighbors heard gunshots that they believed came from the home.[2] The Los Angeles Police

---

[1] Both parties' briefs reference evidence regarding this first DCFS investigation as well as other evidence that is not part of the record because the dependency court ordered it excluded on hearsay grounds upon Father's motion. Accordingly, we neither reference those facts in our opinion nor consider them in determining whether jurisdiction was appropriately exercised over Reece.

[2] Approximately 15 minutes before the police received 911 calls about the gunshots, a neighbor had called the police to report loud music coming from speakers in the tree at the same home.

4

Department (LAPD) had responded to the home in the past and Father was known to have firearms. When law enforcement arrived at the home, they contacted Father by phone. Father denied firing shots, refused to cooperate, and barricaded himself inside the home. The Metropolitan Special Weapons and Tactics Division arrived and Father surrendered only after a two and a half hour standoff. In the course of their search of the home, the police located a large safe, and asked Father to open it so that they could verify there were no guns in it. Father said the safe belonged to his wife and he did not know the combination. The officers obtained a search warrant permitting them to force open the safe, but before they opened it by force, Mother arrived at home and provided the combination.

The following firearms and materials used to manufacture ammunition were found inside the safe: three shotguns (one of which was fully loaded), four rifles, more than 1000 rounds of ammunition, multiple scopes, gunpowder, a bullet machine, a laser sight, and gun simulators. Four spent shotgun rounds were found on the floor of the safe. Three boxes of rifle bullet projectile were found in Father's bedroom.

Father was involuntarily hospitalized on a psychiatric "5150 hold" in 2013 pursuant to Welfare and Institutions Code section 5150, and law enforcement planned to arrest him upon his discharge. He remained in the hospital for seven days. Several months later, he was arrested on an outstanding warrant, then released on his own recognizance and ordered to stay away from the family home.

LAPD Detective Slider initially informed DCFS that Father had been involuntarily hospitalized in 2009 for suicidal thoughts, leading to that allegation being included in the dependency petition, but LAPD Officer Wolleck later informed DCFS that the information was incorrect.

5

### b. *Father's Prior Involvement with Law Enforcement*

According to Officer Wolleck, at the time of the firearm discharge incident, Father previously had been listed as a suspect or victim in over 100 crime reports made to the same police station. What began as noise complaints and charges of disturbing the peace had escalated to charges of trespass, assault, battery, vandalism, verbal threats, assault with a deadly weapon, and violation of a court order. For several years Father had accused his neighbors of conducting illegal narcotics trafficking in the neighborhood. He claimed to be working with the Federal Bureau of Investigation against the "Cartel." He also claimed that he was the subject of constant surveillance. In 2010, the LAPD received information that Father had obtained a shotgun and was keeping it in his garage or near his front door. Consequently, his address was entered into a system as a "special location" requiring a supervisor to respond to his residence every time he called the police.

Three neighbors had active criminal protective orders pending against Father, and Father had a restraining order against one of them, but the existence of restraining orders had done little to dispel the continuing conflict in the neighborhood.

Brian and Rmesios Shahbaghlian, neighbors who live across the street from Father's home, stated that the previous owner also had a restraining order against him. Father had not bothered the Shahbaghlians, but on several occasions he had been seen looking into their house with binoculars. They believed he might have a mental health issue which explained some of his bizarre behavior. Jack Singman, another neighbor who lived behind Father's house, stated that he was not surprised that Father had discharged a gun at his home, as he had done strange things in the past, such as playing amplified music and accusing neighbors of selling drugs.

Any guns in Father's home should have been surrendered after he was served with a restraining order in 2012. Moreover, due to a conviction in the summer of 2013 for violating a restraining order, he was prohibited from owning, purchasing, receiving, possessing or having custody or control of any firearm for 10 years, and any violation of this prohibition constituted a felony.

Father's previous criminal history included a 1987 conviction for disorderly conduct-prostitution, and 1995 convictions for assault with a deadly weapon, assault on a custody officer, battery, resisting arrest, and presenting false identification to a peace officer. He was also arrested for driving under the influence in 1997 and for assaulting a neighbor with a chemical agent in 2009.

Mother told LAPD detectives that most of the guns found in the safe were hers, but she was not able to provide a detailed description or provide any paperwork. She denied purchasing the guns for Father and stated she purchased them as an investment. She said that in 2011 or 2012, when Father was served with a restraining order, she gathered all the guns and gave them to a friend for safekeeping. When the order expired she brought them back to the home and changed the combination so that Father would not have access to them. She wrote the combination down on a piece of paper and hid it in the bill pile in her office. She surmised that Father must have found the combination in her office. She stated that the last time she accessed the safe was a year earlier when she purchased two of the rifles. However, a firearms trace report showed that Mother purchased one of the guns on November 19, 2013, less than two weeks before the incident. Mother stated she had no knowledge of the current restraining orders or of Father's recent conviction for violating one of the restraining orders.

7

### c. *DCFS Interviews with the Family*

Two days after the shooting incident, while Father was still hospitalized, a DCFS caseworker interviewed Reece at the family's home. Reece appeared to be timid and afraid and answered the caseworker's questions in a robotic manner with a flat affect. He stated he was not at home at the time the gun was discharged. He stated that he had never seen any guns in the home, but said that Father taught him about gun safety and how to shoot a gun, although he denied that any gun was discharged during the lessons. He denied ever seeing Father act abnormally, and stated he was not afraid of him and that he felt happy and safe in his parents' care. In a subsequent interview on January 21, 2014, Reece again denied that Father had ever done anything strange or unusual, and said he wanted his family to get back together. Reece denied that he had access to guns in his home and stated he did not know where they were stored. He said he had never gone shooting or hunting before, but that he will be able to learn more about it when he turns 16.

The DCFS caseworker contacted Father by phone while he was in the hospital. He stated he did not want to be interviewed in person and also said he would prefer that his attorney be present for any interview. However, before hanging up he volunteered that Reece was not present at the time of shooting, that Reece is treated very well, and that there are no problems in the home. He stated he would cooperate with DCFS but would not discuss the guns.

After Father was released, he did not make himself available for an interview, despite numerous attempts by the dependency investigator. It also proved difficult for DCFS to schedule monitored visits for Father and Reece. Father did not provide an address or phone number, and stated he could be reached by email. However, he frequently did not respond to emails attempting to schedule visits, or would respond too late.

8

Father attended the Team Decision Making (TDM) meeting on February 26, 2014. He brought a book entitled "The Culture of Fear" and kept playing with the book on the table. He stated that DCFS should be aware of his participation in counseling and parenting classes, and he claimed that the failure of DCFS to report this information to the police led to his arrest. DCFS asked Father to sign a release of information form so that DCFS could receive information from his parenting class instructor and counselor, but Father stated he could not do so because it would violate the Health Insurance Portability and Accountability Act (HIPAA). DCFS explained that Father could grant permission for DCFS to receive this information, but he refused. Father expressed his belief that DCFS "worked with LAPD to cross reference pseudo fear files based on falsehoods."

After the TDM, DCFS attempted to interview Father regarding the allegations of the dependency petition. Father disputed the allegation that he had been suicidal and previously hospitalized (an allegation that LAPD had retracted as erroneous). Father stated he would not make any statements with respect to the criminal case against him based on his counsel's advice and his own common sense. Father denied that he ever had been a danger to his son. The meeting concluded prematurely because another meeting was scheduled in the conference room, but it was agreed that DCFS would email Father so that he could provide a written response to the allegations in the petition. The caseworker emailed him later that day and stated that if Father provided a response or explanation regarding the allegations, they would be included in the next report for the court. Father's email response stated, "Regarding B-1 and B-2: no comment due to ongoing criminal case." Father also sent several emails to DCFS to the effect that state intervention in his family life was groundless and that he wanted to be reunified with his family as soon as possible.

9

In Mother's initial interview with the DCFS caseworker, she stated that she and Reece were at a friend's home at the time of the shooting incident. According to Mother, Father had been testing his gun's "warranty" and this was the first time he had discharged a gun at home. Mother stated that the guns were kept in a locked case and were not accessible to Reece. She stated that law enforcement had removed all the guns the night of the incident. Mother denied any history of domestic violence and denied that Father had any prior history of mental health issues.

In a subsequent interview on January 21, 2014, Mother reported that she worked for herself from home and that Father cared for Reece at home. Mother stated that Father had not been employed for a long time, but he was not on disability. She stated that he isolated himself because he did not work. Although he was anti-social, she did not think he was paranoid or delusional. However, she stated that they had a 16-camera surveillance system and he spent time watching the cameras. Mother had this system installed after someone kept destroying their property, including bashing her gates and slashing her tires. Mother had wanted a simple camera but Father wanted the 16-camera system.

According to Mother, most of Father's criminal convictions were the result of an incident before Reece was born that occurred while she and Father were walking their dog, when Father got into an altercation with another couple walking their dog. Father's criminal record made it difficult for him to find work and he was not allowed to do community service with children or the elderly. Father could not let go of his anger about the situation.

Mother stated that she did not know Father's diagnosis after his involuntary hospitalization on November 27, 2013. She stated that Father participated in therapy earlier in 2013 due to restraining order issues. Mother denied knowing

anything about the basis for the restraining orders and said she is not aware that Father has disputes with neighbors.

With respect to the firearms found in the home, Mother stated that they were kept in the safe and in locked storage cabinets in the garage. She purchased the safe when Reece was born. Reece was aware the guns were there and knew that one of them was his grandfather's antique gun. Father had grown up around guns and the family anticipated that when Reece was older he would go hunting with his extended family. Due to the restraining orders against Father that prohibited him from having access to firearms, Mother had changed the combination to the lock on the safe and kept the keys to the storage cabinets inside the safe. She stated that she had purchased four guns in 2013. Mother was not a hunter but Father and Reece had a "wish list" of hunting guns, and Mother had recently refinanced the home and wanted to buy the guns as an investment and before changes were made to the gun purchasing laws.

Mother did not know where Father was staying after being released from the hospital. She gave him money for housing and everything else. Initially he was staying in a hotel, but she could not afford to keep paying for it. He had been using his gas card to buy food. She denied any substance abuse by Father and stated that although he had taken painkillers for a while after a shoulder replacement five years earlier, he had stopped taking them. She said he did not currently drink alcohol because he was training for a marathon.

Mother reported that Reece was feeling guilty for not being home with Father when the incident took place, and he was having nightmares, nosebleeds, and stomach aches. Mother reported that Father and Reece visited together approximately three times a week, usually at restaurants with Mother acting as the monitor, and that the two were happy to see each other during visits.

11

On January 28, 2014, Mother told the caseworker that the situation with Father had gotten worse and that his recent behavior was "freaking [her] out." She stated that the previous week, Father had a visit with Reece and Mother at a restaurant. He immediately asked what Mother had said to the dependency investigator. Mother replied that they were not supposed to talk about the case, but Father kept asking her and became aggressive with his questioning. He also asked Reece what the social workers asked him until Mother interceded. Father's demeanor was odd, and Reece looked uncomfortable. Mother took Reece to the lobby area and asked if he wanted to leave, but Reece said he wanted to stay.

When they returned, Father asked Reece to sit next to him. Mother noted that Reece did not eat much, and he said he had a stomach ache. Father told Reece, "Your mom is the devil." According to Mother, Father often called her "the devil" because she was adopted. Reece later told her he had heard Father call her that many times before. Although Mother had never questioned Father's behavior before, recently she had begun to realize that his behavior was odd. For instance, Father never accompanied her and Reece to dinners with friends. He had no friends of his own and had cut family members out of his life for no reason.

Mother stated that she had talked to her attorney about getting a protective order because Father's behavior was making her feel unsafe and he had threatened her by stating, "I'm not accountable for my actions." Mother said she had changed all the locks at home.

Mother reported that Father's brother had sent a nice email to Father and Father replied that "the system has f----- me. It's all bogus." Father had also written to his own mother asking her if she would get the guns back and hold them for him, and the grandmother had replied that she would. This concerned Mother because she believed Father would just take the guns from his mother. Mother

stated she wanted to sell the guns so she could get some of her money back, with the exception of one gun that she would like to give to Reece when he turns 21 and another gun that had been passed down for generations on Father's side of the family.

Mother also stated that Father has a gambling problem and that she believed Father was gambling the money she gave him for living expenses. He was constantly asking for more money, including calling her at 3:00 a.m. to ask for more money to pay for prescription medication (ostensibly for one of several medical problems Father was experiencing at the time). She believed he was living out of his car.

On January 31, 2014, Mother reported that Father had been calling her repeatedly and was yelling and being aggressive, to the point that she finally unplugged the phones in the home. He wanted his money for the month, and she had decided to give it to him to keep him at bay. Mother was crying while talking to the investigator and said she feared for Reece's and her safety. On February 3, 2014, Mother reported that she had given Father $1,000 and that the phone calls had subsided. She told the caseworker she was planning to seek a restraining order against Father. The caseworker notified Mother that she was no longer permitted to monitor visits because of the situation with Father.

Several days later, Mother reported that Father had been arrested on February 4, 2014, after he parked his car near their home and called Mother and asked her to bring him some money. She brought him $20 and then some undercover officers appeared and arrested him. According to the police, a neighbor had contacted the LAPD after seeing Father in the neighborhood, and he was arrested on an outstanding felony warrant. Father called Mother and asked her to post bail, but she refused to do so because the bail bond was too expensive.

13

On March 19, 2014, Mother related that Reece had quit his baseball team. At Reece's last game, Father had been watching from across the field, and Mother believed Reece saw him and felt some pressure due to his presence. However, Mother stated that she and Reece had bumped into Father at Target two weeks earlier and had a nice visit, and that she had also taken Reece to meet Father for dinner on March 17, 2014, and they again had a good visit. She stated she was not feeling scared of Father at that time.

d. *Reports on Visitation and Father's Participation in Counseling*

On February 3, 2014, the caseworker left Father a voicemail stating that going forward the she would be monitoring visits with Reece, and that Father should call her to arrange a visitation schedule. However, as of the date of the jurisdictional and disposition hearing on April 21, 2014, DCFS had not monitored any visits between Father and Reece despite numerous efforts to arrange them with Father. Further, although Father asserted that he had been participating in parenting classes and counseling, Father had refused to provide any evidence of his participation in such services.

e. *Witness Testimony at Jurisdiction and Disposition Hearing*

One of Father's neighbors, Jack Singman, testified that on the evening before Thanksgiving in 2013, he heard what sounded like three loud gunshots, and police were called to the neighborhood. When asked if he recalled statements he made to the police that Father does "strange things," like accuse neighbors of selling drugs, he testified that approximately six or seven years earlier Father had told him he had concerns about his next door neighbor. He also testified that

14

sometimes Father played music for extended periods of time when there did not seem to be anyone home.

Another neighbor, Brian Shahbaghlian, testified that he lives across the street from Father. He testified that on the day before Thanksgiving, he was watching a movie, when he heard three popping noises over the noise of the loud action movie. Shortly thereafter, he heard helicopters circling in the area, and then heard voices on his front porch. He looked out and saw tactical officers with rifles pointed across the street.

He testified that a few months before this incident, his wife had seen Father using binoculars from his front porch, looking across the street in the direction of their home. He also testified that the previous owners had disclosed that they had a restraining order against Father.

C. *Court Findings at Jurisdiction and Disposition Hearing*

The dependency court noted that allegation (b)(1) in the dependency petition erroneously stated that Father had been involuntarily hospitalized in 2009, but the court found that the allegation that Father had mental and emotional problems that could endanger Reece otherwise was supported by evidence that Father was paranoid and unstable, that he was defiant, and that he refused to work with the social worker. With respect to allegation (b)(2) -- that Reece was in a dangerous home environment -- the trial court concluded that the allegation should be sustained because (1) Father kept a large arsenal of weapons at the home despite his probation condition prohibiting such possession; (2) Father had fired shots at the home in November 2013; (3) Mother's conduct in hiding the key to the safe from Father demonstrated her fear that Father would use the guns; (4) Father's mental instability was an additional risk factor when coupled with the access to

15

weapons; and (5) Father had been acting aggressively towards Mother, demonstrating a risk of further aggression that extended to Reece. The court thus sustained jurisdiction over Reece. The court further stated that the removal order was based on the same factual findings regarding Father's mental and emotional instability, the loaded firearms, and his willingness to use them.

## DISCUSSION

Father contends that the juvenile court erred in finding that Reece is a person described by section 300, subdivision (b). "On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings. [Citation.] Substantial evidence is evidence that is reasonable, credible, and of solid value." (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.) Any inferences we draw must be reasonable and logical; "'inferences that are the result of mere speculation or conjecture cannot support a finding [citations].' [Citation.]" (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393-1394.)

In order for a court to find that a child is one who is described by section 300, subdivision (b), DCFS must establish that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing,

16

shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b).)

There is no evidence in the record that Reece has suffered any serious physical harm or illness. In the absence of any evidence of past harm suffered by Reece, we examine whether DCFS has shown by a preponderance of the evidence that there is a "substantial risk that the child will suffer, serious physical harm or illness." (§ 300, subd. (b).) Our focus is whether DCFS has proffered substantial evidence that "at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future." (*In re Savannah M., supra,* 131 Cal.App.4th at p. 1396.) The purpose of section 300 "'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) We conclude that the trial court properly sustained jurisdiction under subdivision (b) of section 300 because DCFS presented substantial evidence that Reece was at substantial risk of serious physical harm due to Father's mental and emotional instability and paranoia and the fact that he had amassed a large cache of weapons and demonstrated a willingness to use them.

Although Father contends there was no evidence that he had a mental disorder, expert evidence of "mental illness" is not required in order to assert jurisdiction under section 300. (*In re Khalid H.* (1992) 6 Cal.App.4th 733, 735-

17

736.)  Rather, the trial court properly relied upon other evidence in the record demonstrating that Father had mental health issues.[3]

For instance, according to Mother, Father was antisocial and spent time watching the cameras on the 16-camera surveillance system at the home.  He claimed that he himself was under constant surveillance, and he also claimed to be working with the FBI against the "Cartel."  Father was a party to over 100 crime reports involving neighbors, and three neighbors currently had restraining orders against him.  He was on probation for the recent violation of one of those restraining orders.  As a condition of his probation, Father was prohibited from possessing firearms, and such possession would constitute a felony.  Nevertheless, a large arsenal of weapons (included one loaded gun) and related paraphernalia was found at Father's home, and there was sufficient evidence from which the trial court reasonably could conclude that Father used one of those guns to fire shots at the family's home.  It is also undisputed that afterwards Father barricaded himself

---

[3]     Father contends that the allegation in count (b)(1) of the dependency petition that he suffered from serious emotional and mental issues was improperly sustained because it included the erroneous factual allegation that he attempted suicide in 2009.  Indeed, after the dependency petition was filed, DCFS reported to the court that the police had corrected earlier information it provided that Father had attempted suicide in 2009.  In sustaining count (b)(1), the dependency court did not strike the language regarding the suicide attempt, but stated as follows:  "[T]he involuntary hospitalization is not the only piece of evidence that the court relies on.  And the court is willing to accept that the police said that it was based on an incorrect name."  The court then found that other evidence of Father's paranoia, instability and fear, as well as his defiance and refusal to work with the DCFS caseworker, were sufficient to sustain the allegation that Father had mental and emotional issues.  Thus, the inaccuracy in the petition with respect to a 2009 suicide attempt does not warrant reversal of the jurisdictional orders in this case.  (See *In re Athena P.* (2002) 103 Cal.App.4th 617, 626–628 [So long as sufficient notice was provided to the parent and substantial evidence supports jurisdiction, deficiencies in the allegations of a petition are harmless error]; see also *In re N.M.* (2011) 197 Cal.App.4th 159, 166.)

in his home and a lengthy standoff with law enforcement ensued before he would exit the home. Immediately following this incident, Father was involuntarily hospitalized for seven days.[4] No evidence in the record demonstrates that any physician deemed his hospitalization to have been unwarranted, or deemed him to be mentally stable.

After his release from the hospital, Father continued to show signs of serious mental instability. Mother believed he was gambling away the money she gave him for living expenses and was living in his car. He demonstrated paranoid fears about law enforcement's collusion with DCFS. He exhibited odd behavior at a visit with Reece and Mother, telling Reece that Mother was "the devil," and calling Mother at all hours of the night to ask for more money and yell at her. Moreover, there is no evidence to suggest that Father was taking any steps to address concerns concerning his mental and emotional health, with the exception of his unsubstantiated statements that he was participating in counseling. Father instead consistently refused to cooperate with DCFS or to release information about his participation in counseling or parenting classes. Based on the foregoing, the trial court did not err in concluding that Father had serious mental and emotional issues.

---

[4] Father contends that the sole reason he was involuntarily hospitalized in November 2013 was because the police were operating under the erroneous belief that he already had a history of involuntary hospitalization as a result of a purported suicide attempt in 2009. However, the record does not support his assertion. Rather, the evidence demonstrates that after Father was detained for firing multiple gun shots at his home and then barricading himself in his home for a lengthy period, he was evaluated by the LAPD Mental Evaluation Unit, which made the decision to place him on a 72-hour hold for mental evaluation for being a danger to himself and/or others. Thus, the misunderstanding of another police officer with respect to Father's previous mental health history cannot be blamed for Father's involuntary hospitalization in November 2013.

Father further argues that even assuming that he had mental problems, there was insufficient evidence that Reece was at substantial risk of suffering serious harm as a result. We disagree.

Father is correct that DCFS has the burden to show "evidence of a specific, defined risk of harm to [Reece] resulting from . . . [F]ather's mental illness . . . ." (*In re David M.* (2005) 134 Cal.App.4th 822, 830; see also *In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318 [holding that "harm may not be presumed from the mere fact of mental illness of a parent"]. Father relies on *In re James R.* (2009) 176 Cal.App.4th 129, 136 (*James R.*), in which the appellate court found that the trial court should not have sustained jurisdiction under section 300, subdivision (b), where the minors came to the attention of DCFS after the mother had a negative reaction to taking ibuprofen and drinking beer. The investigation revealed that the mother had a previous history of mental health problems and presently used alcohol. DCFS argued that the minors faced a risk of harm because it was not known if the mother was emotionally stable, and it was possible that if she did not follow through with treatment she could be a danger to herself, which would negatively impact the children. The appellate court concluded that DCFS's concerns were based on mere speculation and thus were insufficient bases for concluding that the children were at risk of future harm. (*Id.* at pp. 136-137.)

Father contends that as in *James R.*, in this case DCFS failed to show specifically how his mental illness would create a substantial risk of serious harm to Reece in the future. *James R.* is distinguishable, however, in part because the mother in that case had never exhibited any violent tendencies and did not maintain a weapons cache like Father did. Father's criminal history included violent crimes, including assaulting a police officer with a deadly weapon. The record further suggests that Father was becoming increasingly aggressive and unstable and was in

20

active disputes with neighbors that appeared to be escalating, despite the restraining orders in place against him. His arsenal of weapons appeared to be growing and he demonstrated a willingness to use the weapons.

Although Father argues that Reece was not at future risk from guns in the home because law enforcement had confiscated them, Mother reported that Father had asked his mother to get his guns back, and despite the fact that he could not possess guns lawfully, Mother feared he would be successful in getting access to guns again. Moreover, although there is no evidence that Reece generally had access to the weapons, which were kept in a locked safe, Father obviously had been handling the weapons outside the safe, as he discharged one of them, albeit while Reece was not at home. Given Father's demonstrated mental instability, and the absence of evidence that he was working to address the issue, it was not unreasonable to conclude that the likely proximity of firearms would put Reece at risk of harm. (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge."].)

In addition, following his release from his involuntary hospitalization stay, Father exhibited aggressive and threatening behavior towards Mother, leading her to fear for her and Reece's safety to the point that she had all the locks changed at home and was considering getting a restraining order against him. This threatening behavior permits a reasonable inference that Reece was directly at risk of harm from Father as well.

In sum, we conclude that substantial evidence establishes that Reece was at substantial risk of serious physical harm, and we affirm the trial court's exercise of dependency jurisdiction.

Father argues that the dispositional orders must be reversed because dependency jurisdiction was not warranted. Because we find that the court

21

properly asserted dependency jurisdiction over Reece, and Father raises no other challenge to the dispositional orders, we likewise affirm the dispositional orders.

## DISPOSITION

The jurisdictional and dispositional orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.

COLLINS, J.